

# SUPREME COURT OF MISSOURI
## en banc

RAYMOND MCCARTY, et al.          )      *Opinion issued April 29, 2025*

        Plaintiffs,              )

v.                                  )     No. SC100876

MISSOURI SECRETARY OF STATE, et al.    )

        Defendants.           )

**ORIGINAL PROCEEDING: ELECTION CONTEST**

This case is not about the policy or merits of Proposition A, an initiative petition voters approved in November 2024. This case addresses the concerns brought by registered Missouri voters Raymond McCarty, Daniel Shaul, Russell Lahl, and Michael Hastings ("Contestants"),[1] as to whether the summary statement and fiscal note summary for Proposition A were so misleading that they constituted an irregularity of sufficient magnitude to cast doubt on the fairness of the election and validity of its results. Because

---

[1] Intervenor-Contestants Missouri Grocers Association, Missouri Restaurant Association, Associated Industries of Missouri, National Federation of Independent Business, Inc., Missouri Forest Products Association, and Missouri Chamber of Commerce and Industry are Missouri nonprofit corporations joining Contestants' arguments that the results of the 2024 general election approving Proposition A should be set aside.

Contestants' claims fall well short of this high standard, this Court finds there was no election irregularity and the election results are valid.

Contestants further allege Proposition A is invalid because it violates the "single subject" and "clear title" requirements of article III, section 50 of the Missouri Constitution. Because this Court lacks original jurisdiction over Contestants' arguments relating to Proposition A's validity, those counts are dismissed without prejudice.

**Background**

Richard von Glahn submitted a sample sheet for proposed Initiative Petition No. 2024-038 ("Proposition A") to the secretary of state pursuant to section 116.332, which sets out the procedures for filing initiative petitions.[2] Missouri statutes provide that, for all statewide ballot measures, an official "ballot title" appears on each ballot rather than the full text of the proposed measure. Section 116.010(4). The ballot title is composed of the summary statement and the fiscal note summary. *Id.* Upon approval of the form of an initiative petition, the secretary of state must draft a summary statement of the measure in the form of a question not exceeding 100 words. Section 116.334.1. Following section 116.334, the secretary of state prepared the summary statement for Proposition A.

The second part of the ballot title is a summary of the fiscal note for the measure. Section 116.010(4). The state auditor prepares the fiscal note and the summary of that

---

[2] All statutory references are to RSMo 2016 unless otherwise noted. All citations to chapter 290 reflect the current statutory language as amended by Proposition A unless otherwise noted. All rule references are to the Missouri Court Rules (2023).

fiscal note. Section 116.175. Pursuant to Missouri law, the auditor sought input from various state and local governmental entities regarding Proposition A's fiscal impact. The Missouri Department of Labor and Industrial Relations reported one-time costs of up to $53,329 for information technology and office equipment and annual costs of up to $255,975 for staff to receive and investigate complaints. The only county indicating a fiscal impact was Clay County, which estimated additional costs of $2,000 per year between the circuit court and prosecutor to enforce Proposition A's misdemeanor and civil action provisions. The auditor then drafted the fiscal note and the fiscal note summary.

The ballot title for Proposition A, in its entirety, read:

Do you want to amend Missouri law to:

- increase minimum wage January 1, 2025 to $13.75 per hour, increasing $1.25 per hour each year until 2026, when the minimum wage would be $15.00 per hour;
- adjust minimum wage based on changes in the Consumer Price Index each January beginning in 2027;
- require all employers to provide one hour of paid sick leave for every thirty hours worked;
- allow the Department of Labor and Industrial Relations to provide oversight and enforcement; and
- exempt governmental entities, political subdivisions, school districts and education institutions?

State governmental entities estimate one-time costs ranging from $0 to $53,000, and ongoing costs ranging from $0 to at least $256,000 per year by 2027. State and local government tax revenue could change by an unknown annual amount depending on business decisions.

Proposition A supporters submitted more than 200,000 signatures in support of the petition. The secretary of state verified the signatures and issued a certificate of

3

sufficiency, finding the measure complied with the Missouri Constitution and chapter 116. At the November 2024 general election, Missouri voters approved Proposition A. Contestants timely brought an election contest in this Court seeking a new election pursuant to sections 115.555 and 115.593.[3]

## Analysis

This case is not about the merits of increasing the minimum wage and providing paid sick leave for certain workers. Rather, the issues to be decided in this case are limited to whether the auditor's fiscal note summary and the secretary of state's ballot summary statement for Proposition A were so materially inaccurate and seriously misleading that they cast doubt on the fairness of the election and the validity of its results.

### I. This Court has original jurisdiction over Contestants' chapter 115 election irregularity challenges

Proponents dispute this Court's original jurisdiction to hear post-election ballot title challenges. This Court, however, has consistently held it has original jurisdiction over post-election contests pursuant to chapter 115. *Dotson v. Kander*, 464 S.W.3d 190, 193 n.2 (Mo. banc 2015) ("This Court has jurisdiction to hear this [chapter 115 election contest] pursuant to Mo. Const. art. VII, sec. 5 and section 115.555."); *Shoemyer v. Mo.*

---

[3] Jobs with Justice Ballot Fund and Richard von Glahn ("Proponents") moved to intervene as a matter of right pursuant to section 115.553.2 and Rule 52.12 as proponents of the measure. This Court sustained the motion. Jobs with Justice Ballot Fund is a Missouri continuing committee within the meaning of section 130.011(10) and a Missouri nonprofit corporation. Richard von Glahn is a registered voter in the state of Missouri.

*Sec'y of State*, 464 S.W.3d 171, 173 n.2 (Mo. banc 2015) (finding this Court had jurisdiction over the chapter 115 election contest "pursuant to Mo. Const. art. VII, sec. 5 and section 115.555.").[4]  Indeed, this Court just last year affirmed *Dotson* and *Shoemyer*, confirming its original jurisdiction over election contests in *Lucas v. Ashcroft*, 688 S.W.3d 204, 214 (Mo. banc 2024).[5]

As *Lucas* explained, this Court derives its original jurisdiction to hear post-election contests from article VII, section 5 of the Missouri Constitution and section 115.555.  *Id.* at 214-15.[6]  Article VII, section 5 grants the general assembly the authority to decide which courts will have original jurisdiction over election contests.  With this constitutional authority, the general assembly enacted section 115.555, which provides "all contests to the results of elections … on state statutes submitted or referred to the voters … shall be heard and determined by the supreme court."

Despite the extensive jurisdictional analysis this Court just undertook in *Lucas* in affirming *Dotson* and *Shoemyer*, Proponents dispute the basis for those cases and ask this Court to again consider their validity.  This Court foreclosed such argument in *Lucas*,

---

[4] In *Dotson*, voters brought an original action in this Court challenging the sufficiency and fairness of a ballot title post-election. 464 S.W.3d at 193.  Similarly, in *Shoemyer*, the plaintiffs filed a post-election contest in this Court challenging the summary statement in a ballot title.  464 S.W.3d at 173.
[5] In *Lucas*, a contestant brought an original action in this Court contesting the results of an election for a proposed constitutional amendment based on an irregularity in the ballot title's fiscal note summary.  688 S.W.3d at 211.
[6] Although *Lucas* addressed a post-election contest involving a constitutional amendment, section 115.555 provides "all contests to the results of elections on constitutional amendments" and "state statutes submitted or referred to the voters … shall be heard and determined by the supreme court."  Consequently, *Lucas*' analysis of article VII, section 5 and section 115.555 applies here.

5

explaining, "Whether one agrees with the basis for *Dotson* and *Shoemyer* …, it cannot be argued the holdings in those cases are evidently contrary to reason, flatly absurd or unjust, or clearly erroneous and manifestly wrong." 688 S.W.3d at 214.

*Lucas* further held the enduring rationales of *stare decisis* required this Court follow the holdings of *Dotson* and *Shoemyer*. *Id.* Intervenor-Contestees cite no recent or intervening cases necessitating this Court to reconsider *Dotson*, *Shoemyer*, or *Lucas*. As *stare decisis* required *Lucas* follow *Dotson* and *Shoemyer*, *stare decisis* requires this Court follow *Lucas* in the instant case. Contestants brought this election contest in this Court following section 115.555 and the holdings of *Dotson*, *Shoemyer*, and *Lucas*. If this Court determines now it lacks jurisdiction over Contestants' chapter 115 claims, they will be precluded from raising those challenges.[7] *See Lucas*, 688 S.W.3d at 214 ("Foreclosing [the contestant's] claims now, in spite of this justified reliance, would result in an injustice because it would leave him unable to bring these claims in any court of law."). This Court must follow *Dotson*, *Shoemyer*, and *Lucas* to avoid such an injustice. *Id.*

**II.  The Ballot Title Was Not an Irregularity That Casts Doubt on the Entire Election**

This Court has long recognized the importance of the initiative process. *See No Bans on Choice v. Ashcroft*, 638 S.W.3d 484, 486 (Mo. banc 2022) (observing Missouri voters first adopted a constitutional amendment establishing the right of referendum in

---

[7] As section 115.555 is the only statute allowing post-election challenges of state statutes, if that statute is unconstitutional, no other court has jurisdiction to hear this matter. *See Lucas*, 688 S.W.3d at 214 n.6.

1908).  Indeed, "[n]othing in our constitution so closely models participatory democracy in its pure form." *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990).

Consequently, when courts are asked to intervene in the initiative process, "they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course." *Id.*  In the same vein, courts are to liberally construe constitutional and statutory provisions related to the initiative process to give effect to the people's constitutionally derived power to propose and enact laws.  *Id.*; Mo. Const. art. III, sec. 49.

Here, Contestants challenge both parts of the ballot title—the summary statement and the fiscal note summary—of Proposition A.  When the sufficiency of a ballot title is challenged post-election, this Court must determine if the ballot title failed to meet the requirements of chapter 116 because a chapter 115 election irregularity cannot exist without an underlying chapter 116 violation of the sufficiency and fairness standard required for ballot titles.  *Dotson*, 464 S.W.3d at 195.

Even if a ballot title failed to meet the requirements of chapter 116, a violation of chapter 116 does not conclude the analysis when a contestant brings a ballot title challenge post-election.  If a ballot title constitutes an irregularity, a contestant must also demonstrate the "irregularity casts doubt on the entire election sufficient to justify setting

aside its results" to be entitled to a new election pursuant to section 115.593. *Lucas*, 688 S.W.3d at 230-31. [8]

Accordingly, Contestants must establish: (1) the ballot title was unfair and insufficient pursuant to chapter 116; and (2) any alleged irregularities cast doubt on the entire election sufficient to justify setting aside its results.

**A. The Summary Statement**

Section 116.190.3 requires a summary statement be sufficient and fair. *Brown v. Carnahan*, 370 S.W.3d 637, 653 (Mo. banc 2012). For a summary statement to be sufficient and fair, it "must be adequate and state the consequences of the initiative without bias, prejudice, deception, or favoritism." *Dotson*, 464 S.W.3d at 195 (internal quotation omitted). The summary statement must fairly and impartially summarize the purposes of the proposed measure to prevent voters from being deceived or misled. *Brown*, 370 S.W.3d at 654. Because section 116.334 requires a 100-word limit, the summary statement need not "set out the details of the proposal or resolve every peripheral question related to it." *Mo. Mun. League v. Carnahan*, 303 S.W.3d 573, 586 (Mo. App. 2010). A summary statement "should inform voters of the central feature[s] of the initiative or referendum proposal." *Pippens v. Ashcroft*, 606 S.W.3d 689, 701 (Mo.

---

[8] Section 115.593 permits this Court to order a new election if "there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election[.]" *Dotson* held a challenge to a proposed measure's ballot title may be brought as an election "irregularity" in a post-election action pursuant to chapter 115 if the issue had not been previously litigated and determined. 464 S.W.3d at 195. Section 116.020 provides, "This chapter shall apply to elections on statewide ballot measures. The election procedures contained in chapter 115 shall apply to elections on statewide ballot measures[.]"

App. 2020) (alteration in original) (internal quotation omitted).  The test is whether the summary statement language fairly and impartially summarized the purpose of the initiative, not whether the secretary of state used the best language.  *Asher v. Carnahan*, 268 S.W.3d 427, 431 (Mo. App. 2008).

### i. Change in Existing Law

Contestants allege the summary statement misrepresented the effect Proposition A would have when compared with existing law.  They contend the summary statement improperly suggested Missouri law would be amended to require an annual adjustment based on the consumer price index when such requirement is already part of Missouri law.[9]  They analogize the instant case to *Missouri Municipal League*, 303 S.W.3d at 588, holding a summary statement may be misleading if it leads voters to erroneously believe a measure would change existing law when it did not.

The second bullet point of the summary statement provided: "[Do you want to amend Missouri law to:] adjust minimum wage based on changes in the Consumer Price Index each January beginning in 2027[?]"  Prior to Proposition A's enactment, section 290.502.3, RSMo Supp. 2019, set a minimum wage rate for public employers and private sector employers.  Proposition A amended section 290.502.3 to increase the minimum wage for private employers to $13.75 per hour in 2025 and to $15.00 per hour in 2026.

---

[9] Prior to Proposition A's enactment, section 290.502.2, RSMo Supp. 2019, provided the minimum wage shall be increased or decreased by the increase or decrease in the cost of living as measured by "the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) or successor index as published by the U.S. Department of Labor or its successor agency, with the amount of the minimum wage increase or decrease rounded to the nearest five cents."

Proposition A then indexes that rate to the consumer price index each January beginning in 2027. Although section 290.502.2, RSMo Supp. 2019, already provided for cost-of-living adjustments according to the consumer price index, the summary statement accurately explained Proposition A set a new baseline for minimum wage in 2025 and 2026 with statutory cost-of-living adjustments to the minimum wage beginning in 2027.[10] *See Mo. Mun. League v. Carnahan*, 364 S.W.3d 548, 553 (Mo. App. 2011) (noting that referencing something already in Missouri law does not automatically make a proposal unfair or prejudicial). The summary statement's reference to the consumer price index fairly summarized what Proposition A's minimum wage provisions would accomplish. *Id.* ("All that is required is that the language fairly summarizes the proposal in a way that is impartial and does not deceive or mislead voters.").

*ii. Sick Leave Provisions*

Contestants argue the summary statement failed to notify voters of various elements of Proposition A's sick leave provisions. Specifically, Contestants argue the summary statement failed to notify voters of the following: not all employees get sick

---

[10] Contestants' reliance on *Missouri Municipal League*, 303 S.W.3d at 575, is further misplaced because *Missouri Municipal League* was a pre-election challenge. As Contestants chose to challenge the summary statement post-election, they must establish any irregularity cast doubt on the entire election sufficient to justify setting aside its results. Section 115.593. For that reason, even if Proposition A restated existing law, *Missouri Municipal League* is not indistinguishable. Contestants offer no argument as to how Proposition A's reference to the consumer price index was an irregularity that cast doubt on the entire election to a sufficient magnitude to justify a new election pursuant to section 115.593.

leave and not all employees get the same sick leave[11]; "sick leave" goes beyond leave for illness or health related issues[12]; there are exemptions from the sick leave provisions[13]; and Proposition A establishes a new crime.[14] Contestants also argue the summary statement improperly suggested all educational institutions are exempt from Proposition A's provisions.[15]

---

[11] Contestants allege voters were misled because the summary statement failed to explain that not every employee would be eligible for sick leave and not every employee would receive the same amount of sick leave. The summary statement accurately stated employees would accrue one hour of sick leave for every 30 hours worked even though Proposition A provides differences in the total amount of sick leave an employee can use based on the employer's size. Pursuant to Proposition A's provisions, employees of an employer with 15 or more employees are capped at using 56 hours per year unless the employer sets a higher limit. Section 290.603.1. Employees at organizations with fewer than 15 employees are capped at using 40 hours of sick leave per year unless the employer sets a higher limit. Section 290.603.2. Although the summary statement did not specify the differences in sick leave caps, these provisions were not central features of Proposition A.

[12] Proposition A requires employers to provide leave for "[a]bsence necessary due to domestic violence, sexual assault, or stalking" for an employee or an employee's family member. Section 290.606.1(4). Contestants argue the use of the term "sick leave" failed to notify voters the measure would require employers provide leave for absences "unrelated to being 'sick.'"

[13] Proposition A contains 12 exemptions from the definition of "employee." Section 290.600(5). Proposition A further provides exemptions for some employers from providing paid sick. Contestants allege to have accurately described the consequences of the measure, the summary statement should have said "certain" employers would be subject to Proposition A's provisions.

[14] Section 290.624.1 of Proposition A provides: "Any employer who willfully violates or fails to comply with any of the provisions and requirements of sections 290.600 through 290.642 shall be guilty of a class C misdemeanor[.]" Contestants argue the summary statement failed to notify voters Proposition A established a new crime and the summary statement suggested to voters oversight and enforcement would be left to the department of labor, not local prosecutors.

[15] The last bullet point of the summary statement for Proposition A read: "[Do you want to amend Missouri law to:] exempt governmental entities, political subdivisions, school districts and education institutions?" Contestants argue this falsely suggested to voters that all educational institutions were exempt from the provisions of Proposition A when

11

Contestants further allege the summary statement misleadingly and inaccurately told voters no one but the department of labor and industrial relations had oversight and enforcement powers over Proposition A, but the measure also grants local governments authority for oversight and enforcement.[16] Moreover, Contestants argue the failure to specify that the summary statement's final two bullet points applied only to the sick leave provisions rendered the summary statement misleading.[17]

These arguments go to the detail in which the summary statement outlined Proposition A's provisions. It is well-settled that a summary statement need not, and

_____

the only entities that are exempt are public higher-education institutions. They contend the summary's use of "education institutions" was inaccurate and misled voters into thinking the exemptions were broader than the measure provides.

[16] Section 290.621 authorizes local governments to investigate and ascertain compliance with Proposition A. Section 290.621.3 provides, in part:

> A municipality, county, city, town, or village may adopt ordinances, rules, and regulations to investigate and ascertain compliance with sections 290.600 through 290.642, establish and implement a system to receive complaints regarding noncompliance with sections 290.600 through 290.642 and to investigate and attempt to resolve complaints between the complainant and the subject of the complaint, and establish additional means of enforcement, with respect to employers within, or employees performing work while physically present in, the geographic boundaries of the municipality, county, city, town, or village.

[17] The summary statement's last two bullet points asked voters if they wanted to amend Missouri law to:

- allow the Department of Labor and Industrial Relations to provide oversight and enforcement; and
- exempt governmental entities, political subdivisions, school districts and education institutions?

Although Proposition A could have used better or more specific language to inform voters the last two bullet points applied only to the sick leave provisions, this Court is not tasked with determining whether the best language was used. *Dotson*, 464 S.W.3d at 196. Because the summary statement fairly and impartially summarized the central purpose of Proposition A, Contestants' argument fails.

often cannot, set out all details of a proposal. *Hill v. Ashcroft*, 526 S.W.3d 299, 308 (Mo. App. 2017). The 100-word limit of a summary statement inherently means the summary statement will not address all aspects of a proposed measure. The summary statement is intended to give voters enough information to be aware of the proposal's subject and purpose to allow voters to make an informed decision as to whether to investigate the initiative further. *Id.* Accordingly, a summary statement can be sufficient and fair even if the language could have been more specific and even if more specificity is preferable. *Protect Consumers' Access to Quality Home Care Coal., LLC v. Kander*, 488 S.W.3d 665, 671 (Mo. App. 2015). The use of broad language is permitted to express a proposal's central features and may "encompass matters not included in the measure so long as it is not deceptive, misleading, or argumentative." *Hill*, 526 S.W.3d at 308.

The summary statement's sick leave provisions accurately and impartially informed voters Proposition A would: require employers to provide one hour of sick leave to employees for every 30 hours worked; allow oversight and enforcement; and exempt public governmental entities. As the summary statement sufficiently and fairly set forth Proposition A's central features regarding sick leave, Contestants' arguments fail.

### iii. The Summary Statement Was Not an Election Irregularity

Contestants argue the unfairness and insufficiency of the summary statement is an election irregularity sufficient to cast doubt on the true result of the vote in Proposition A such that this Court should order a new election. Because the summary statement accurately and impartially set forth Proposition A's central features, the summary

13

statement does not amount to an election irregularity. *Dotson*, 464 S.W.3d at 200 (holding, because the summary statement was sufficient and fair, the contestants failed to show an election irregularity under chapter 115).

Even if Contestants established the summary statement amounted to an irregularity, they wholly fail to demonstrate any irregularity was of a sufficient magnitude to cast doubt on the election's validity pursuant to section 115.593. Throughout their brief, Contestants make conclusory allegations that the summary statement's language misled voters but offer no evidence to support these conclusions.[18] As this Court concludes that the summary statement was not misleading, there was no election irregularity based on the summary statement. Consequently, a new election is not warranted.

## B. The Fiscal Note Summary

The next issue is whether the fiscal note summary printed on every ballot in the 2024 general election was an inaccurate and misleading summary of the fiscal note itself. Specifically, Contestants allege the fiscal note summary was insufficient and unfair because it failed to identify the costs to private entities and local governments.

Section 116.175.1 provides "the auditor shall assess the fiscal impact of the proposed measure." After finalizing the fiscal note, the auditor must prepare a brief

---

[18] This Court has noted there is no specific quantum of evidence necessary to demonstrate that an irregularity cast doubt on the results of the election. *Lucas*, 688 S.W.3d at 231. Here, however, Contestants fail to demonstrate any existence of an irregularity, concluding the analysis of whether this Court must order a new election pursuant to section 115.593.

14

summary of the fiscal note. Section 116.175.2. The auditor must use "language neither argumentative nor likely to create prejudice either for or against the proposed measure." Section 116.175.3. Within that statutory imperative, the auditor has considerable discretion in determining how best to summarize the fiscal note given the 50-word limitation (not including articles). *Lucas*, 688 S.W.3d at 225.

Based on the responses received, the auditor prepared a fiscal note describing the potential fiscal impact of Proposition A. The auditor's summary of the fiscal note, which appeared on every ballot, stated: "State governmental entities estimate one-time costs ranging from $0 to $53,000, and ongoing costs ranging from $0 to at least $256,000 per year by 2027. State and local government tax revenue could change by an unknown annual amount depending on business decisions."

### i. Private Costs

Contestants argue the fiscal note summary failed to state the financial impact to private employers expressed by the Missouri Budget Project.[19] The Missouri Budget Project submitted a fiscal impact statement, which is contained in the full fiscal note. That statement provided estimated costs to private employers and state administration along with estimated net savings and estimated societal benefit.

The auditor has discretion when drafting the fiscal note summary, but the fiscal note summary must be consistent with the fiscal note. *Lucas*, 688 S.W.3d at 228. Although the auditor is not bound by all submissions received, "once information is

---

[19] The Missouri Budget Project is a nonprofit organization.

included in the fiscal note without rejection or qualification, the auditor is bound to craft a summary that adequately and without bias, prejudice, or favoritism synopsize[s] the fiscal note." *Id.* at 227 (alteration in original) (emphasis omitted) (internal quotation omitted).

Contestants maintain that, because private costs were included in the fiscal note without qualification, limitation, or rebuttal, the fiscal note summary was required to include such costs. Contestants, however, challenge the fiscal note summary post-election. Consequently, they must show the omission of the private costs in the Missouri Budget Project information from the fiscal note summary was ***materially inaccurate*** and ***seriously misleading*** to establish an election irregularity. *Id.* at 231.

The auditor is not required to include private costs in the fiscal note or the fiscal note summary. Section 116.175.3 requires the fiscal note and fiscal note summary to state a measure's "estimated cost or saving, if any, to state or local governmental entities." *See also Protect Consumers' Access*, 488 S.W.3d at 676-77 ("[T]here is no requirement [in section 116.175.3] that the Auditor include a statement regarding the impact to small businesses in the fiscal note and nothing requires the Auditor to undertake its own investigation on the measure's impact to small businesses.").[20]

---

[20] Contestants further allege the fiscal note summary inaccurately and misleadingly suggested the ongoing costs to the state are just "$0 to at least $256,000 per year by 2027," whereas the fiscal note suggests the actual costs are many multiples of that estimate. The Missouri Budget Project's submission combined the estimated costs of private employers with state administrative costs into one lump sum of $679.77 million in total estimated costs. That estimate did not break out the potential cost the state itself would bear.

Because the fiscal note summary adhered to section 116.175.3's directive to state costs to governmental entities, the omission of private costs the Missouri Budget Project reported was not materially inaccurate or seriously misleading as to constitute an election irregularity.

Even if Contestants established the omission of private costs was an election irregularity, more is required for this Court to order a new election. Contestants also must demonstrate the omission of private costs from the fiscal note summary was an irregularity of sufficient magnitude to cast doubt on the validity of the election under section 115.593. *Lucas*, 688 S.W.3d at 230-31. This Court has held there is no strict requirement as to what kind of evidence a contestant must adduce to meet this burden of proof. *Dotson*, 464 S.W.3d at 195 ("While the plaintiffs did not present evidence of particular voters who were misled by the ballot title, this is not fatal to their claim under chapter 115."). Each case must be evaluated on its own basis. *Lucas*, 688 S.W.3d at 231.[21]

---

The Missouri Budget Project statement also provided "previous estimates show a cost associated with state level administration and enforcement for earned sick leave of approximately $1 million." Those previous calculations conflict with the 2023 fiscal impact submission by the department of labor and industrial relations directly addressing Proposition A, which was included in the fiscal note summary. It was within the auditor's discretion to rely on the most recent estimate submitted directly by the department of labor and industrial relations regarding costs to state entities.

[21] In *Lucas*, the contestant offered opinion poll evidence and expert opinions to support the argument that the fiscal note summary misled voters. 688 S.W.3d at 231. The Court, however, noted it might have still inferred the material defects in the fiscal note summary cast doubt on the entire election based on the size and nature of the defects and the fact they were the last information the voters saw before voting. *Id.* at 231 n.25.

Although the auditor may not draft a summary materially departing from the fiscal note, an omission that is neither material nor misleading cannot, on its face, constitute an election irregularity that casts doubt on the validity of an election. Here, the fiscal note summary sufficiently informed voters of Proposition A's fiscal impact to state governmental entities as required by chapter 116. Contestants make no argument as to how the omission of private costs both misled voters *and* cast doubt on the results of the election. Because Contestants fail to establish both a material omission and an irregularity that casts doubt on the entire election, their challenge must fail.[22]

*ii. Clay County's Fiscal Impact*

Contestants further argue the fiscal note summary was insufficient and unfair because it failed to state local costs Clay County identified. Clay County officials submitted to the auditor a potential fiscal impact of $2,000 based on additional resources needed to enforce Proposition A's misdemeanor and civil action provisions. The fiscal note reflected that submission and provided:

> Officials from **Clay County** indicated this petition does not apply to county governments under 290.502.4 for minimum wage and the contemplated new

---

[22] This is not to say an omission could never be material or misleading. Here, however, the auditor did not abuse his discretion in focusing the fiscal note summary on governmental costs and savings as section 116.175.3 requires, particularly where the omitted costs were immaterial. Accordingly, the fiscal note summary was not unfair or insufficient. Even so, Contestants brought this challenge pursuant to chapter 115 after voters approved Proposition A. As such, their burden of proof is much higher than if they had brought the same ballot title challenges pre-election pursuant to chapter 116. Because the fiscal note summary did not violate the much lower pre-election review standard in chapter 116, it could not violate the higher post-election chapter 115 review standard for election irregularities, much less constitute an irregularity of sufficient magnitude to cast doubt on the election as a whole.

Section 6 for sick leave regarding the definition of an employer. Clay County provides more generous sick leave than this measure as well.

They do estimate additional costs from this petition of **$2,000** a year between the Circuit Court and Prosecutor to enforce the misdemeanor and civil action provisions.

The other counties that responded to the auditor's request indicated there would be no estimated costs or savings to report for Proposition A. Contestants argue, because Clay County's costs were included in the fiscal note "without rejection or qualification," the auditor was required to include the costs in the fiscal note summary. *Lucas*, 688 S.W.3d at 227. Contestants allege it follows that, because voters were not apprised of these costs, the omission constitutes an election irregularity and requires a new election.

Contestants equate the instant case to *Lucas*, in which Kansas City officials reported an estimated cost of $38 million per year from the measure at issue, but the fiscal note summary indicated there would be no additional costs or savings related to the proposed measure. *Id.* at 226. This Court held the fiscal note summary failed to accurately advise the voters of the fiscal impact of the proposed measure as set forth in the fiscal note. *Id.* at 230. *Lucas*, however, also instructs "not every ballot title that is insufficient or unfair for purposes of a pre-election challenge under section 116.190 will be an 'irregularity' of such magnitude to justify a new election under section 115.593." *Id.* at 231.

Contestants argue the costs Clay County reported constitute a significant fiscal impact when the costs are compounded across dozens of counties. This is false, however, as every other county that responded to the auditor's request indicated there would be no

19

estimated costs or savings to report for Proposition A. Furthermore, the auditor was not required to independently research the estimated local costs. "[I]t is not the Auditor's responsibility to undertake an independent investigation and comment upon a possible impact to state finances if no submissions are made to the Auditor describing those impacts." *Protect Consumers' Access*, 488 S.W.3d at 676.

Here, the $2,000 Clay County reported represents less than one percent of the $256,000 in annual costs to the state the department of labor and industrial relations estimated. Clay County's fiscal impact is *de minimis* when compared with the fiscal impact stated in the fiscal note summary. Moreover, the additional costs Clay County reported would be incurred through enforcing the criminal and civil action provisions of Proposition A. These costs would result from events that have not yet happened and may not happen as the enforcement of those provisions is discretionary. The auditor may not draft a fiscal note summary that "departs in material respects from the fiscal note itself[.]" *Lucas*, 688 S.W.3d at 227. Contestants fail to establish excluding Clay County's costs rendered the fiscal note summary **materially** inaccurate and **seriously** misleading.

Even if this Court were to accept the fiscal note summary amounted to an irregularity, Contestants must further demonstrate the irregularity casts doubt on the entire election sufficient to justify setting aside its results. *Id.* at 230-31. Accepting Contestants' argument would lead to a *de facto* rule that any omission of a reported cost from a fiscal note summary would render an election invalid. But that is not the standard for determining whether a new election is warranted pursuant to section 115.593. Because Contestants fail to establish the $2,000 Clay County reported—less than one

20

percent of the fiscal impact included in the fiscal note summary—was both a material omission and an irregularity that casts doubt on the entire election, their challenge must fail.

### III. This Court Lacks Original Jurisdiction over Contestants' Single Subject and Clear Title Counts

Contestants' petition raises two counts alleging Proposition A violated the "single subject" and "clear title" requirements of article III, section 50 of the Missouri Constitution. "The essential bases of a court's authority to adjudicate a controversy are its jurisdiction over the subject matter of the controversy and jurisdiction over the parties." *McCracken v. Wal-Mart Stores E., LP*, 298 S.W.3d 473, 476 (Mo. banc 2009) (internal quotation omitted). "[T]he subject matter jurisdiction of Missouri's courts is governed directly by the state's constitution." *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 253 (Mo. banc 2009).

As stated above, section 115.555, through article VII, section 5 of the Missouri Constitution, grants this Court original jurisdiction over "all contests to the results of elections … on state statutes[.]" Section 115.557 further provides this Court exclusive jurisdiction "over all matters relating to the contest[.]" As held in *Dotson*, *Shoemyer*, and *Lucas*, this Court has original jurisdiction over election irregularities. This Court has not, however, held its original jurisdiction extends past irregularities governed by chapter 115. Accordingly, this Court's post-election authority over "all matters relating to the contest" refers to matters relating to the election *process*. The *validity* of Proposition A—the question raised by Contestants' clear title and single subject claims—is not a matter

related to the election process.  As those arguments do not relate to the fairness of the election, they are not election irregularities that fall within this Court's constitutionally and statutorily derived original jurisdiction.

Contestants cite provisions of the Missouri Rules of Civil Procedure to assert this Court can hear all of their claims.  For example, Rule 55.06(a), allowing joinder of claims, provides, "A party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim may join, either as independent or as alternate claims, as many claims, legal or equitable, as the party has against an opposing party."  Contestants further cite Rule 55.32, requiring counterclaims arising out of the same transaction or occurrence that is the subject matter of the opposing party's claims to be brought in the same matter if the court can acquire jurisdiction over the necessary parties.  Contestants argue the facts relevant to their validity arguments arise from the same facts as their ballot title challenges.

Even so, the fundamental question for any claim is whether such claim falls within the court's jurisdiction.  The dilemma this Court faces in the instant case—in which only some of the claims arising from the same transaction or occurrence fall within the court's jurisdiction—does not often arise in the circuit court, where most lawsuits originate, as circuit courts have "original jurisdiction over all cases and matters, civil and criminal." Mo. Const. art. V, sec. 14.  This Court's original jurisdiction, however, is limited and cannot extend to claims outside its constitutionally and statutorily granted authority.

"Dismissal for lack of subject matter jurisdiction is appropriate whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction."

22

*McCracken*, 298 S.W.3d at 476 (Mo. banc 2009) (internal quotation omitted).  Because

this Court lacks original jurisdiction over Contestants' Counts III and IV, those counts are

dismissed without prejudice.

## Conclusion

Because Contestants failed to show either the summary statement or the fiscal note

summary were insufficient or unfair and because Contestants failed to meet the much

higher burden of showing an election irregularity, this Court rejects those claims and

holds the results of the election adopting Proposition A are valid.  Contestants' Counts III

and IV alleging single subject and clear title violations are dismissed without prejudice

for lack of jurisdiction.

 

 

 

_____

Mary R. Russell, Chief Justice

 

Powell, Fischer, Wilson, Broniec,
and Gooch, JJ., concur.
Ransom, J., filed separate opinion.



# SUPREME COURT OF MISSOURI
## en banc

RAYMOND MCCARTY, ET AL.,       )
                                         )
         Plaintiffs,            )
                                         )
v.                                        )       No. SC100876
                                         )
MISSOURI SECRETARY OF STATE, ET AL.      )
                                         )
         Defendants.        )
                                         )

## SEPARATE OPINION

For the reasons stated in my dissenting opinion in *Lucas v. Ashcroft*, 688 S.W.3d 204, 235-41 (Mo. banc 2024) (Ransom, J., dissenting), I disagree this Court possesses original jurisdiction over election contests of this nature. Perpetuating the jurisdictional determination in *Dotson v. Kander*, 464 S.W.3d 190, 193 n.2 (Mo. banc 2015), is not warranted. *If* article VII, section 5 of the Missouri Constitution permitted this Court to have original jurisdiction to hear post-election ballot title challenges, I would concur with the principal opinion's conclusion that the ballot title here was not an irregularity casting doubt on the election. But no aspect of that constitutional provision concerns matters other

than election contests for public officers.  I agree with the principal opinion's separate holding that this Court lacks original jurisdiction over the single subject and clear title challenges.  There is no constitutional basis for this Court to have original jurisdiction over those counts.

_____
Robin Ransom, Judge